UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MITCHELL ENTERPRISES, INC., d/b/a MITCHELL ELECTRIC, an Idaho corporation, DANNY G. MITCHELL and TERESA A. MITCHELL, husband and wife, Idaho residents,<br><br>Plaintiffs,<br><br>v.<br><br>MR. ELECTRIC CORP., a Texas corporation, THE DWYER GROUP, a Texas corporation, and DOES 1-10, inclusive,<br><br>Defendants. | Case No. CV 11-0537-REB<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(DOCKET NO. 34)** |

Currently pending before the Court is Defendants' Motion for Summary Judgment (Docket No. 34). Having carefully considered the record, heard the oral argument of counsel, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. GENERAL BACKGROUND

1.      Plaintiff Mitchell Electric is a family-owned and family-operated electrical contractor that specializes in renovations and troubleshooting in the Treasure Valley area of Idaho. *See* Compl., ¶ 11 (Docket No. 2). Mitchell Electric has provided electrical contractor services in the Treasure Valley since 1969. *See id.* Mitchell Electric's current owners and operators are Plaintiffs Danny and Teresa Mitchell. *See id.*

2.      In the early-to mid-1990's, Mitchell Electric developed a copyrighted software system to manage all aspects of its business records, including customer lists, contact

**MEMORANDUM DECISION AND ORDER - 1**

information, employee personnel files, time sheets, inventory, project bids, invoices, sales documents, and financial statements. *See id*. at ¶ 12.

3.  In 2007, Mitchell Electric began to develop an upgraded version of its software with the intention of marketing it to other service providers. *See id*. at ¶ 13. According to Mitchell Electric, the original and upgraded versions of the software (collectively, the "Mitchell Dispatch Software"), along with the proprietary business information it contained (the "Data"), "served as the lifeblood of Mitchell Electric's business success." *Id*.

4.  In the same 2007 year, Mitchell Electric explored the possibility of becoming a franchisee of Defendant Mr. Electric. *See id*. at ¶¶ 14 & 15; *see also* Defs.' U.F. No. 4 (Docket No. 34, Att. 2); Pls.' Stmt. of Disputed Facts No. 4 (Docket No. 53, Att. 1). Since 1994, Mr. Electric has offered franchises which sell, service, and repair electrical systems, equipment, components, and supplies, including installation, upgrades, and remodeling for residential and commercial customers. *See* Defs.' U.F. No. 1 (Docket No. 34, Att. 2); Pls.' Stmt. of Disputed Facts No. 1 (Docket No. 53, Att. 1).

5.  On October 26, 2007, Mitchell Electric and Mr. Electric entered into a Franchise Agreement under which Mitchell Electric became Mr. Electric's franchisee in Ada County and Canyon County, Idaho. *See* Compl., ¶ 16 (Docket No. 2). Mitchell Electric claims that the Franchise Agreement (1) permitted Mitchell Electric to continue to own and develop the Mitchell Dispatch Software and the Data as a separate business opportunity, and (2) permitted Mitchell Electric to utilize the Mitchell Dispatch Software and the Data for its business operations rather than Mr. Electric's ZWARE software (a database system designed for Mr.

**MEMORANDUM DECISION AND ORDER - 2**

Electric franchisees and customized for use in Mr. Electric's franchise system).  *See id.* at ¶¶ 15 & 17; *see also* Defs.' U.F. No. 7 (Docket No. 34, Att. 2); Pls.' Stmt. of Disputed Facts No. 7 (Docket No. 53, Att. 1) .

6.     Also on October 26, 2007, Mitchell Electric and Mr. Electric executed a ZWARE License and Maintenance Agreement (the "ZWARE Agreement"), whereby Mitchell Electric agreed to license the ZWARE software from Mr. Electric and to cooperate in installing and supporting the ZWARE software on Mitchell Electric's computer network.  *See* Compl., ¶ 18 (Docket No. 2); *see also* Defs.' U.F. No. 7 (Docket No. 34, Att. 2); Pls.' Stmt. of Disputed Facts No. 7 (Docket No. 53, Att. 1).  Even so, Mitchell Electric insists that, at the time the parties executed the ZWARE Agreement, Mr. Electric assured Mitchell Electric that, although Mr. Electric required each franchisee to install the ZWARE software on its computer network, Mitchell Electric could nonetheless use the Mitchell Dispatch Software and the Data to conduct its business operations rather than the ZWARE software.  *See* Compl., ¶ 19 (Docket No. 2). Soon thereafter, the ZWARE software was installed on Mitchell Electric's computer network. *See* Defs.' U.F. No. 9 (Docket No. 34, Att. 2).[1]

7.     On August 23, 2009, Mitchell Electric met with Mr. Electric, expressing frustrations about various aspects of the franchise relationship and explained that Mitchell Electric was experiencing financial difficulties due to Mr. Electric's alleged inadequate support and pricing structure.  *See* Compl., ¶ 20 (Docket No. 2); *see also* Ans., ¶ 20 (Docket No. 11).

---

[1]  Mitchell Electric disputes this fact, however, in doing so, states only that Mr. Electric assured Mitchell Electric that Mitchell Electric could continue to use the Mitchell Dispatch Software for its business operations.  *See* Pls.' Stmt. of Disputed Facts No. 9 (Docket No. 53, Att. 1).  In other words, Mitchell Electric does not seem to actually dispute that the ZWARE software was eventually installed on Mitchell Electric's computer network.

**MEMORANDUM DECISION AND ORDER - 3**

8.     Later on August 23, 2009, Mrs. Mitchell attempted to remotely access Mitchell

Electric's computer from a home computer.  *See* Compl., ¶ 21 (Docket No. 2).  Mitchell Electric

claims that,

> Upon doing so, [Mrs. Mitchell] noticed unusual activity in Mitchell
> Electric's computer network and observed what appeared to be the
> copying of certain Mitchell Electric computer files from some other
> remote location.  Subsequently, the Mitchells not only lost all access
> to the Mitchell Electric computer network and the Mitchell Dispatch
> Software and the Data, but they also found that the Mitchells' home
> computers, including the personal computers of the Mitchells' five
> children, had seemingly crashed.

*Id*.  In turn, on either August 23, 2009 or August 24, 2009, Mitchell Electric contacted Mr.

Electric to ask if Mr. Electric's system had been compromised in a way that might explain the

difficulties the Mitchells were experiencing with their office and home computers.  *See id*. at

¶ 22; *see also* Answer, ¶ 22 (Docket No. 11).  Mr. Electric responded that its computer network

had not been compromised.  *See id*.

9.     Thereafter, Mitchell Electric retained the services of a computer forensics

company to evaluate Mitchell Electric's computer network and the Mitchells' home computers.

*See* Compl., ¶ 23 (Docket No. 2).

10.     Mitchell Electric claims that on November 5, 2009, the forensics company (1)

"reported that the ZWARE software had attempted to connect to all thirteen hard drives in

Mitchell Electric's and the Mitchells' computer network, and the investigation also uncovered

numerous link files in the server that referenced ZWARE, Mr. Electric, and [Defendant] Dwyer

Group," and (2) "concluded that Defendants had utilized the ZWARE software to gain

unauthorized access to Mitchell Electric's and the Mitchells' computers."  *Id*. at ¶ 24.

10.     Claiming damages owing to Mr. Electric's allegedly "unlawful acts," Plaintiffs

filed a Complaint on November 4, 2011, asserting the following claims against Defendants: (1)

violation of the Computer Fraud and Abuse Act ("CFAA") (Count 1); (2) violation of the Idaho

Trade Secrets Act ("ITSA") (Count 2); (3) conversion (Count 3); and (4) tortious interference

with prospective economic advantage (Count 4). *See id*. at ¶¶ 25-53.[2]

11.     Defendants deny the allegations.  In the pending Motion for Summary Judgment,

Defendants argue that:

> [P]laintiffs have failed to establish a genuine dispute of material fact
> on elements essential to their claims entitling Defendants to judgment
> as a matter of law on all claims stated in the Complaint.  Plaintiffs
> have failed to produce any evidence to establish (a) that Defendants
> gained unauthorized access to Plaintiffs' computer network (or any
> specific computer) or (b) that, even assuming *arguendo* Defendants'
> unauthorized access, that Defendants (i) caused any damage to the
> computers or data contained on the computers, (ii) converted, used,
> disclosed, or otherwise misappropriated any data or software
> contained on the computers, or (iii) actually interfered with or caused
> any harm to any potential or actual economic relationship or
> expectation of Plaintiffs.

Mot. for Summ. J., p. 2 (Docket No. 34).

## II.  DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986).  It is "not a disfavored procedural shortcut," but is

---

[2]  Apparently, Plaintiffs have clarified that, while Count 1 is brought by all Plaintiffs,
Counts 2, 3, and 4 are brought by Plaintiff Mitchell Electric only.  *See* Mem. in Supp. of MSJ, p.
11, n.7 (Docket No. 34, Att. 1).  For ease of reference, the term "Plaintiffs" is a collective
reference within this Decision, unless otherwise indicated.

instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *See id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, if the nonmoving party bears the burden of persuasion at trial, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go

**MEMORANDUM DECISION AND ORDER - 6**

beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *See Celotex*, 477 U.S. at 324.

However, the court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).  Instead, the "party opposing summary judgment must direct [the court's] attention to specific triable facts."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

**B.      Plaintiffs' CFAA Claim (Count 1) is Time-Barred**

In addition to their substantive arguments attacking Plaintiffs' CFAA claim, Defendants contend that the claim is procedurally barred by the applicable statute of limitations.  *See* Mem. in Supp. of MSJ, pp. 5-6 (Docket No. 34, Att. 1).

The CFAA contains a two-year statute of limitations period.  It begins on "the date of the act complained of or the date of the discovery of the damage."  18 U.S.C. § 1030(g).  "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  Defendants argue that Plaintiffs were aware of the damage to their computer network (and even suspected Defendants and/or the ZWARE software to be the cause of that damage) as of August 23 or 24, 2009 – more than 26 months *before* filing their Complaint on November 4, 2011.  *See id*. at p. 6 ("On this evidentiary record, there can be no genuine dispute that Plaintiffs' filed their action under the CFAA beyond the Act's limitations period.  Their CFAA claim is time-barred.").  In response, Plaintiffs do not deny that, on or

around August 23, 2009, they suspected that their computer network was compromised in some way. *See* Pls.' Stmt. of Disputed Facts No. 10 (Docket No. 53, Att. 1) (not disputing that "act complained of" for purposes of CFAA occurred on August 23, 2009). However, they submit that their CFAA claim did not actually "accrue" until November 5, 2009, when they received the first computer forensics report detailing the damage to its computer network, the Mitchell Dispatch Software, and the Data. *See* Opp. to MSJ, p. 4 (Docket No. 53). In other words, Plaintiffs take the position that a later-alleged date reflecting their discovery of the "details of damage" should control the date the statute of limitations begins to run on their CFAA claim.

Plaintiffs' argument that the statute of limitations only began to run upon a forensic confirmation of their behalf of damage, rather than the date that such apparent damage became known to them is without merit. They admit that the act complained of – Mr. Electric's alleged intrusion of Defendants' computers – occurred more than two years before they filed this lawsuit. Their argument, however, would add an otherwise unexpressed layer to the statute's description of the statute of limitations – one that contemplates a more developed level of knowledge surrounding the discovery of claimed damage. To be clear, the CFAA requires a plaintiff to file suit within two years of discovering "'any impairment to the integrity or availability of data, a program, a system, or information.'" *Clark Street Wine and Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 486 (E.D.N.Y. 2010) (quoting 18 U.S.C. § 1030(e)(8)). Through their Complaint, Plaintiffs admit that the genesis of their CFAA claim began around August 23, 2009 when they first became aware of problems with their computer network, including unauthorized file copying, loss of computer access, and system crashes. *See*

**MEMORANDUM DECISION AND ORDER - 8**

Compl., ¶¶ 21 & 22 (Docket No. 2).[3]  There is no requirement that the damage be confirmed by some sort of independent forensic examination.  To add such a requirement would create a wandering line in the application of the statute of limitations, a line that would only be set if and when a party obtained such a separate or independent confirmation. That is not required to constitute the "discovery" of "damage" under the CFAA.  The fact that Defendants were not exactly aware of whom or what caused the damage as of August 24, 2009 is immaterial, when considering that such detail is unequivocally not required under the CFAA to trigger its two-year limitations period.  *See, e.g.*, *Higgins v. NMI Enters., Inc.*, 2013 WL 4525635, *10-11 (E.D. La. 2013) ("There is no mention [in the CFAA] that a plaintiff must know the alleged perpetrator for the statute of limitations to begin. . . . .  Here, Smith knew of unauthorized access to the computer system, which prompted Smith to initiate an internal investigation . . . .  Thus, it is clear that Smith had an 'awareness of an unauthorized access into [Thundervision's] computer system,' which began the statute of limitations period more than two years before this action was filed.").

Plaintiffs identified what they alleged to be (1) an unauthorized access into their computer system that (2) caused corresponding damage, before November 4, 2009.  Accordingly, their CFAA claim against Defendants, even if otherwise viable, is time-barred under the CFAA's statute of limitations.  Defendants' Motion for Summary Judgment is granted in this respect.[4]

---

[3]  Even disregarding August 23, 2009's factual backdrop, Plaintiffs go on to admit that they then retained the services of a computer forensics company to address the issue.  *See* Compl., ¶ 23 (Docket No. 2).  Though it is unclear when this actually took place, it is reasonable to assume it happened well before November 4, 2009 (two years before the Complaint's November 4, 2011 filing) given the computer forensics company's November 5, 2009 report back to Defendants.  *See id*. at ¶ 24.

[4]  Given the Court's dismissal of Plaintiffs' CFAA claim on statute of limitations grounds, there is no need to consider Defendants' other arguments concerning whether Plaintiffs have properly stated a CFAA claim.

**C.     Defendants are Entitled to Summary Judgment on Plaintiffs' ITSA Claim (Count 2)**

The parties agree that, to prevail on a claim for misappropriation of trade secrets under the ITSA, a plaintiff must show that (1) it owned a trade secret; (2) the defendant acquired, disclosed, or used that trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.  *See Northwest Bec-Corp v. Home Living Serv.*, 41 P.3d 263, 268 (Idaho 2002); *Basic American, Inc. v. Shatila*, 992 P.2d 175, 183 (Idaho 1999); *see also* I.C. § 48-801(2); *Compare* Mem. in Supp. of MSJ, p. 12 (Docket No. 34, Att. 1), *with* Opp. to MSJ, pp. 12-13 (Docket No. 53).  Defendants argue that "there is no evidence that Defendants acquired, disclosed, or used the Mitchell Dispatch Software or any information, data, or other possible trade secret material belonging to Mitchell Electric."  Mem. in Supp. of MSJ, p. 11 (Docket No. 34, Att. 1).

In response, Plaintiffs do not identify evidence that Defendants either disclosed or used the alleged trade secrets; rather, Plaintiffs submit that "[t]here is evidence that Defendants acquired the [Mitchell Dispatch Software] and the data contained therein."  Opp. to MSJ, p. 13 (Docket No. 53).  According to Plaintiffs, that evidence is circumstantial, and takes the form of the following:

- "Mitchell Electric had never experienced any significant computer issues, problems, or unusual activity before becoming a Mr. Electric franchisee and permitting ZWARE to be installed on its computer network." *Id.* (citing Pls.' Stmt. of Disputed Facts No. 13 (Docket No. 53, Att. 1)).

- "After ZWARE was installed, Teresa Mitchell and Danny Mitchell personally witnessed files being copied with no input commands when Teresa Mitchell remotely logged onto her work computer on August 23, 2009." *Id.*

- "A folder that had never been seen by Teresa Mitchell or Danny Mitchell entitled ZWARE.zip inexplicably appeared on the desktop of Teresa

Mitchell's work computer and it contained a Quickbooks file with Mitchell accounting data and employee information." *Id.*

• "A unique, unprecedented browser link appeared in the browser history of Teresa Mitchell's work computer." *Id.* at pp. 13-14.

• "Mitchell had never before utilized ZWARE in any form or fashion." *Id.*

The Court has carefully considered these factual allegations. However, even accepting such facts and any related reasonable inferences in favor of Plaintiffs, such evidence does not establish a prima facie case of Defendants' "acquisition" of Plaintiffs' trade secrets, as those terms are used in the ITSA. In other words, none of this evidence points toward Defendants actually coming into possession of Plaintiffs' claimed trade secrets through improper means or otherwise.

Seemingly recognizing this obstacle, Plaintiffs go on to identify additional circumstantial evidence that *could* be construed as suggestive of Defendants' ultimate acquisition of Plaintiffs' trade secrets:

• "ZWARE possesses the capability to do everything witnessed by Teresa and Danny Mitchell, and the lone changed variable prior to the unusual activity and damage was the installation of ZWARE on Mitchell's computers." *Id.* at p. 14.

• "ZWARE has the ability to create .zip files, just like the ZWARE.zip file that inexplicably appeared on the desktop of Teresa Mitchell's work computer." *Id.*

• "The copy of ZWARE installed on Mitchell's computers was 'pointed' at Mitchell's Quickbooks file." *Id.*

• "ZWARE has the capability to communicate with and send a query to Quickbooks, to search for Quickbooks data and transmit files through a file transfer protocol." *Id.*

• "Not only does ZWARE have these capabilities, the Quickbooks files located in the ZWARE.zip file that inexplicably appeared on the desktop of Teresa

Mitchell's work computer directly interacted with ZWARE and the Quickbooks files were modified during that interaction." *Id.*

- "Additionally, ZWARE contains components called 'NES2.' NES2 opens a port for purposes of remote access to a computer. Significantly, NES2 opens TCP, or remote access, ports and attempts to run a 'send' and 'receive' transmit function about once a minute. This transmit function packages files from the computer on which it is installed and attempts to send them to a remote server. It appears that NES2 'is able to automatically transfer files online without the user's direct intervention.'" *Id.*

At first blush, these circumstances reflect an argument that, owing to Mr. Electric's ZWARE software system's capabilities, a material issue of fact exists as to whether Defendants acquired Plaintiffs' alleged trade secrets. However, these circumstances do not exist in isolation; when examined more closely, the inferences to be drawn therefrom lose their persuasive sway in establishing a material issue of fact. To begin, in support of their opposition to dismissal of their ITSA, Plaintiffs rely almost exclusively upon Dylan Evans' June 12, 2013 Declaration and attached reports. *See id*; *see also* Pls.' Stmt. of Disputed Facts No. 13 (Docket No. 53, Att. 1) (citing Evans Decl (Docket No. 53, Att. 5)). But Mr. Evans' reports are not as conclusive on the issue of Defendants' liability as Plaintiffs would have this Court believe.

For example, while Mr. Evans' July 24, 2012 report states that the ZWARE software "has the capability to search for Quickbooks data and transmit files through FTP" and "has the capability to create .zip files, backup Quickbooks data, and that the particular copy installed on the Mitchell Electric network was pointed to the company Quickbooks file," he goes on to concede that these actions/functions require manual/user intervention – "that is, it does not happen without a user first logging in and then clicking the corresponding button." 7/24/12 Rpt.,

attached as Ex. C to Evans Decl. (Docket No. 53, Att. 9).[5]  Relevant here, Mr. Evans ultimately

concludes in no uncertain terms that:

> *No automatically-executing component of the ZWARE software was discovered to be present on the Mitchell Electric network, including the NES2 Components, nor was unauthorized external remote access software detected.*

*Id.* (emphasis added).  The point here is that the circumstances offered to suggest that

Defendants acquired (and, in turn, misappropriated) Plaintiffs' trade secrets paint an incomplete

picture.  It is apparently true that the ZWARE software has the capacity to perform in a certain

way that could contribute to complications within a computer network system, so long as

specific preconditions are satisfied; yet, on the ultimate question of whether Defendants and the

ZWARE software bear any responsibility for Plaintiffs' alleged damages, Mr. Evans defers –

even when he had multiple opportunities to say so.[6]

Mr. Evans' deposition testimony confirms as much, when in response to Defendants'

counsel's questions concerning allegations made in Plaintiffs' Complaint, he testified:

> Q:     Okay.  Do you have an understanding in your discussions, either by e-mail or otherwise, with any of the Plaintiffs, either Ms. or Mr. Mitchell of Mr.

---

[5]  Mr. Evans' August 29, 2012 report similarly states that ZWARE's ability to access Quickbooks company files requires manual intervention.  *See* 8/29/12 Rpt., attached as Ex. D to Evans Decl. (Docket No. 53, Att. 10) ("ZWARE will not automatically interact with Quickbooks unless a user clicks a series of buttons within ZWARE.").  Likewise, Mr. Evans' April 18, 2012 report states that the NES2 components need to be "extracted from an archive and then installed separately."  4/18/12 Rpt., attached as Ex. B to Evans Decl. (Docket No. 53, Att. 7).

[6]  Mr. Evans' June 12, 2013 report offers an "alternative explanation" to what allegedly took place with Plaintiffs' computer network system – the presence of ActMon/malware.  *See* 6/12/13 Rpt., attached as Ex. E to Evans Decl. (Docket No. 53, Att. 11).  Notably, however, the June 12, 2013 report altogether avoids attributing the ActMon presence to Defendants or the ZWARE software.  Separately, even though posited as an "alternative explanation," Mr. Evans determined that "[t]here is no evidence to conclude that ActMon directly caused any of the behavior or data destruction reported by Mrs. Mitchell . . . ."  *Id.*

**MEMORANDUM DECISION AND ORDER - 13**

Dixon or any of the lawyers for the Plaintiffs in this case, that that issue you just mentioned is at issue in this case, whether there was some unauthorized access to the Mitchells' computers?

A: Yes, I understand that's an issue in this case.

Q: Okay. Do you also understand that another issue in this case is whether or not there was any loss or destruction of data as a result of that kind of unauthorized access to those computers?

A: Yes.

Q: Okay. Let me ask you this: Do you believe that there's any evidence that there was unauthorized access by any of the defendants in this case?

A: No, I do not.

Q: Is there any evidence, to your understanding, that there were any data that has been lost or destroyed as a result of some unauthorized access by the Defendants in this case?

A: Could you rephrase that?

Q: You bet I could. You've indicated you don't believe there's any evidence of an unauthorized access event by the Defendants; correct?

A: Correct.

Q: So you therefore, I assume, would agree with me that there is also no evidence that you're aware of that data on the Mitchells' computers was lost or destroyed as a result of that kind of access event?

A: That's correct.

Q: You don't know of such evidence?

A: I found none.

Evans Dep. at pp. 26-27, attached as Ex. KAC-7 to Cameron Decl. (Docket No. 39, Att. 9). Mr. Evans went on to agree with Defendants' expert, Jerry Hatchett, that the Complaint's reference at paragraphs 24 to an alleged forensics investigation/report finding that the ZWARE software

gained unauthorized access (or exceeded any authorized access) to Mitchell Electric's and the

Mitchells' computers (*see supra*), was *not* an opinion that he (Evans) shared:

> Q:      Okay.  Now, if we'd just go back to Mr. Hatchett's report . . . .  I think that you mentioned that [paragraph] 24 [of the Complaint] that Mr. Hatchett quotes . . ., it includes some findings, those are not your findings, I think is what you said; is that right?
>
> A:      That's correct.
>
> Q:      Okay.  He then says that he can only assume . . . "that the above passage," and he's talking about that paragraph 24 from the Complaint, "is referring to a report other than the Evans Report, or else there's been a gross misinterpretation and presentation of the essence of the Evans Report. Specifically, I find nothing in the Evans Report that substantiates [paragraph] 24 from the Complaint."  Would you agree with him on that?
>
> A:      I would.
>
> Q:      You would?
>
> A:      Yes.
>
> Q:      Okay.  He also indicates, the last sentence of that same paragraph we were just reading, it says, "In fact, I would opine that Mr. Evans quite carefully states that at each step of the process that he cannot conclude that anything suspect took place."  Would you agree with that statement?
>
> A:      I would.

*Id*. at pp. 31-32.  Later, Mr. Evans candidly testified that he disagreed with Plaintiffs' subjective

belief that Defendants and its ZWARE software accessed and damaged Plaintiffs' computer

network system:

> Q:      Okay.  Did you know or come to know during the course of your work on this matter that Ms. Mitchell has an opinion about the two questions we talked about, that is, the access event and data destruction as a result of the access event?
>
> A:      Yes, I am aware of her opinion.

**MEMORANDUM DECISION AND ORDER - 15**

Q:     What are her opinions?

A:     She believes that unauthorized access was gained to her computer.

Q:     And as a result she believes data was destroyed or lost?

A:     Correct.

Q:     Okay. Whether intentionally or unintentionally as a result of the activity of the Defendants; correct?

A:     Correct.

Q:     And you disagree with both of those opinions?

A:     I do. . . . .

Q:     And just to be clear, "I do," you do disagree?

A:     I do disagree.

Q:     Okay. And that disagreement is a result of your own independent analysis in this case?

A:     Correct.

*Id*. at pp. 37-38. At its core, Mr. Evans sided with Mr. Hatchett (Defendants' expert) vis à vis

Defendants' alleged liability:

Q:     Okay. [Mr. Hatchett] then says [at paragraph 9 of his report], "To date I have seen nothing to indicate anything nefarious has occurred." Do you agree with that?

A:     Yes.[7]

Q:     He also says, "I see no evidence suggesting that defendants used ZWARE to

_____

[7]  To be fair, Mr. Evans subsequently stated in his June 12, 2013 report that "[n]efarious activity was indeed being performed on the Mitchell network," due to ActMon and the entity that installed ActMon. *See* 6/12/13 Rpt., attached as Ex. E to Evans Decl. (Docket No. 53, Att. 11) (discussed *supra*). Regardless, Mr. Evans never suggests that Defendants or the ZWARE software are associated with this "alternative explanation." *See supra*.

**MEMORANDUM DECISION AND ORDER - 16**

gain unauthorized access to Plaintiffs' systems or data." Do you agree with that?

A:    Yes.

Q:    "Or to cause damage to Plaintiffs' systems or data." Do you agree with that as well?

A:    Yes.

Q:    Okay. He also says, "Moreover, I do not see any findings or conclusions by Plaintiffs' own expert that establish such activity." Do you agree with that?

A:    Yes.

Q:    He also says the following . . ., "But I have seen nothing to suggest any intentional cause of such a corruption as opposed to a routine failure of technology, the likes of which happen countless times per day in the computing universe." Do you agree with that?

A:    I do.

*Id*. at pp. 41-42. Simply put, Mr. Evans' opinions do not support Plaintiffs' allegation that Defendants' acquired and/or misappropriated their trade secret information. Further, Mr. Evans' opinions do nothing to cut against Mr. Hatchett's expert opinion to the contrary.

To that end, Mr. Hatchett unequivocally opines that his analysis (incorporating Mr. Evans' own testimony and reports) indicates that there is no evidence (1) "to support the allegations that Defendants and/or ZWARE committed any unauthorized access, querying, gathering, or intrusion activity on any of Plaintiffs' computers," or (2) "that Defendants caused any damage to or unauthorized transmission of Plaintiffs' data." Hatchett Decl., ¶¶ 10 & 12 (Docket No. 37); *see also* 3/20/13 Rpt. (Docket No. 37, Att. 10) ("I found absolutely no evidence in the forensic record (or the reports and testimony of Plaintiffs' expert, for that matter) that Defendants caused damage to or theft of any of Plaintiffs' data."). Mr. Hatchett does not stop

**MEMORANDUM DECISION AND ORDER - 17**

there, he goes on to say: "[A]fter considering the totality of the evidence available in this case, I cannot presently recall investigating another case in which such serious allegations have been made, pursued, and maintained notwithstanding and despite an utter dearth of supporting evidence." Hatchett Decl., ¶ 9 (Docket No. 37); *see also* 3/20/13 Rpt. (Docket No. 37, Att. 10). Mr. Hatchett then attributes the situation (and the very continued existence of this litigation) to Plaintiffs' apparent inability to acknowledge the facts:

> When deposed, Plaintiffs' expert and each of the technology-related witnesses who examined the computers and the alleged damage[8] . . . agreed with my position that there is no evidence of any intrusion having taken place in the [Mitchell Data Universe] or that Defendants caused any damage to or unauthorized transmission of Plaintiffs' data. Despite this position from their own expert and hired technicians, Plaintiffs continue to insist that the evidence does exist.

> Although Mrs. Mitchell testified that she is not a technical person – and her testimony bears that concession out as accurate – she contradicts her own experts and continues to drive this process forward based on data and artifacts that she obviously has no understanding of, and many of which she is personally responsible for creating. When Mrs. Mitchell is asked to point out the evidence that not one of five involved technologists was able to find, it becomes obvious that virtually any reference to Defendants or to ZWARE anywhere within the [Mitchell Data Universe] is considered by her to be evidence of malfeasance by Defendants, no matter how unconnected, remote, routine, or expected the reference is. As noted above, however, that viewpoint finds absolutely no support in the evidence or the conclusions reached by both me and Plaintiffs' own expert, Dylan Evans.

---

8 Defendants argue that "[t]he individuals and/or companies who authored the 'reports' referenced and relied in paragraphs 23 through 27 of the Complaint have fully and completely recanted any allegation or inference in such reports charging Defendants with unlawful access and/or causing any damage to Plaintiffs' computers or data." Defs.' U.F. No. 17 (Docket No. 34, Att. 2) (citing G2 Research/Goldston Dep. at pp. 40-48, 73, 76-78, 81-84, 98-99, attached as Ex. KAC-8 to Cameron Decl. (Docket No. 39, Att. 10); Intermountain Network Solutions Dep. at pp. 58, 62-64, 98-99, attached as Ex. KAC-9 to Cameron Decl. (Docket No. 39, Att. 11); Virtual IT Dep. at pp. 90-93, 110-12, 116, 141-43, 146-48, attached as Ex. KAC-10 to Cameron Decl. (Docket No. 39, Atts. 12 & 13)). In response, Plaintiffs simply state that such facts are disputed, while referring back to Mr. Evans' June 12, 2013 Declaration and attached reports. *See* Pls.' Stmt. of Disputed Facts No. 17 (Docket No. 53, Att. 1). This is not enough to dispute that certain allegations in Plaintiffs' Complaint may no longer accurately apply.

**MEMORANDUM DECISION AND ORDER - 18**

3/20/13 Rpt. (Docket No. 37, Att. 10).  Importantly, Mr. Hatchett's opinions as to Defendants' alleged liability are unrebutted by anyone with the appropriate level of expertise.

With all this in mind, whatever circumstantial evidence may have originally existed in support of a claim that Defendants' misappropriated Plaintiffs' trade secrets is not just rebutted, but effectively eviscerated, when contrasted against the more developed, direct, and expert-based evidence in the record.[9]  Even if the great bulk of the evidence obtained through the experts could be viewed to be disputed by the factual assertions coming from Plaintiffs themselves, no reasonable minds could differ upon the answer to that dispute, and therefore there is no genuine issue of material fact.  Hence, without stating here that Plaintiffs have no claim at all for their alleged damage, there is a failure of evidence to support a claim under the ITSA.  Defendants' Motion for Summary Judgment is granted in this respect.[10]

**D.**      **Defendants are Entitled to Summary Judgment on Plaintiffs' Conversion Claim (Count 3)**

"Generally, conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his or her rights therein depriving him or her of possession, permanently or for an indefinite time."  *Med. Recovery Servs., LLC v. Bonneville*

---

[9]  Additionally, with respect to any argument that Plaintiffs never experienced significant computer issues before becoming a Mr. Electric franchisee and having the ZWARE software installed on its computer network, it should be pointed out that ZWARE was installed in November 2007 – nearly two years before the events of August 23, 2009.  *See* Reply in Supp. of MSJ, p. 2, n.2 (Docket No. 55).

[10]  Given the Court's dismissal of Plaintiffs' ITSA claim given the absence of evidence that Defendants acquired/misappropriated Defendants' trade secrets, it need not address Defendants' other argument that Defendants suffered no damage by the alleged misappropriation.

**MEMORANDUM DECISION AND ORDER - 19**

*Billing*, 2013 WL 20474, *2 (Idaho Ct. App. 2013) (citing *Schlieff v. Bistline*, 15 P.2d 726, 728 (Idaho 1932)).  Actual possession of the property by the owner is not necessary; all that is required is either title to the property or a "right to possess the property at the time of the conversion."  *W. Idaho Prod. Credit Ass'n v. Simplot Feed Lots, Inc.*, 678 P.2d 52, 54 (1984).  Defendants argue that Plaintiffs "cannot make a *prima facie* case for conversion because there is no evidence that Defendants ever acquired or used the Mitchell Dispatch Software or related business data."  Mem. in Supp. of MSJ, p. 14 (Docket No. 34, Att. 1).

In response, Plaintiffs contend that "[t]here is evidence that Defendants took possession and converted the [Mitchell Dispatch Software] and the data contained therein."  Opp. to MSJ, p. 16 (Docket No. 53).  To support such a contention, Plaintiffs offer the exact same evidence (indeed, presented verbatim) that they did to oppose Defendants' efforts to dismiss Plaintiffs' ITSA claim – essentially, that the ZWARE software has the capability of exercising dominion over Defendants' computer network system.  *See id*. at pp. 16-17.

For the same reasons that Plaintiffs cannot show that Defendants acquired and/or misappropriated their trade secrets (*see supra*), they likewise cannot show that Defendants converted the Mitchell Dispatch Software or the Data for its own use.  Defendants' Motion for Summary Judgment is granted in this respect.[11]

### E.  Defendants are Entitled to Summary Judgment on Plaintiffs' Tortious Interference with Prospective Economic Advantage Claim (Count 4)

Plaintiffs' claim for tortious interference with a prospective economic advantage requires proof of: (1) the existence of a valid economic expectancy, (2) Defendants' knowledge of the

---

[11]  Given the Court's dismissal of Plaintiffs' conversion claim, and the reasons for doing so, it need not address Defendants' other argument that Defendants suffered no damage by the alleged conversion.

expectancy, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) Plaintiffs' resulting damage whose expectancy has been disrupted.  *See Cantwell v. City of Boise*, 191 P.3d 205, 216 (Idaho 2008); *Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Trust*, 177 P.3d 955, 964 (Idaho 2008).  Defendants argue that Plaintiffs cannot show (1) that Mitchell Electric had a valid prospective economic expectancy with which Defendants interfered; (2) Defendants actually interfered with any business relationship, customer, or potential customer of Mitchell Electric; or (3) that Defendants' alleged conduct caused it any actual harm or damages.  *See* Mem. in Supp. of MSJ, p. 16 (Docket No. 34, Att. 1).

In response, Plaintiffs contend, in part, that "[t]here is evidence that Defendants "interfered with the [Mitchell Dispatch Software] and the data contained therein."  Opp. to MSJ, p. 18 (Docket No. 53).  To support such a contention, Plaintiffs again put forward the exact same evidence (indeed, presented verbatim) offered to oppose Defendants' efforts to dismiss Plaintiffs' ITSA and conversion claims – essentially, that the ZWARE software has the capability of interfering with Defendants' computer network system.  *See id*. at pp. 18-19.

For the same reasons that Plaintiffs cannot show that Defendants either acquired and/or misappropriated their trade secrets or converted the Mitchell Dispatch Software or the Data for its own use (*see supra*), they likewise cannot show that Defendants actually interfered with the Mitchell Dispatch Software or its Data so as to induce the termination of any alleged economic expectancy – even assuming such an expectancy's existence.  Defendants' Motion for Summary Judgment is granted in this respect.[12]

---

[12]  Given the Court's dismissal of Plaintiffs' tortious interference with prospective economic advantage claim based upon the lack of evidence of actual interference with any alleged economic expectancy, it need not address Defendants' other argument that Defendants had no valid economic expectancy and suffered no damage by the alleged interference.

### III. **ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants' Motion for

Summary Judgment (Docket No. 34) is GRANTED in its entirety.



DATED:  **April 7, 2014**

Honorable Ronald E. Bush
U. S. Magistrate Judge